IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

AARON FLEMONS                                                                           PLAINTIFF

v.                      Civil No. 2:16-CV-02037

JOHN DEVANE,                                                       DEFENDANTS
MS. JACKSON (Jail Administrator),
MILLER (Jail Administrator),
SGT. TAULBEE, DEPUTY PARTAIN,
DEPUTY FRAZIER, DEPUTY BATES,
DEPUTY ADAMS, DEPUTY CURRY, and
DEPUTY DUMAS

## ORDER

Plaintiff, Aaron Flemons, proceeds in this matter *pro se* and *in forma pauperis* pursuant to 42 U.S.C. § 1983. Currently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 48).

## I. BACKGROUND

Plaintiff filed his Complaint on February 24, 2016. (ECF No. 1). He filed his Amended Complaint on March 28, 2016. (ECF No. 6). Plaintiff alleges excessive force was utilized against him on two occasions during his incarceration in the Sebastian County Detention Center ("SCDC"). (*Id*. at 6-18). Plaintiff alleges the first incident occurred on February 12, 2014, while he was being escorted to his barracks by Defendants Steele, Woods, and Hobbs. (*Id*. at 11-13). Plaintiff alleges Defendant Steele pushed him through the barracks gate, forced him to the ground, and instructed Defendant Woods to pepper-spray him. Plaintiff alleges he was not resisting during the incident. (*Id*. at 11-12). Plaintiff alleges Defendant Hobbs was present and failed to protect him from the other deputies. (*Id*. at 13). Plaintiff alleges Defendants Devane, Taulbee, and Jackson failed to properly train their deputies in the use of force. He further alleges they adopted

1

a custom or practice of improperly training deputies, inadequately supervising deputies, failing to investigate excessive force claims, and maintaining a "Code of Silence" regarding the misuse of force. (*Id*. at 14-15).

Plaintiff alleges the second incident occurred on July 1, 2015, when he was scheduled for a court appearance. (*Id*. at 15). Plaintiff alleges he was called to go to court earlier than his paperwork indicated. He alleges he asked Defendant Frazier to check the times, and Frazier became upset with him. While Plaintiff was gathering his paperwork for court, Defendant Frazier stood in the cell doorway and aimed the infrared laser sight of the taser at his stomach and chest. (*Id*. at 15). When he reached the barracks gate, Defendant Frazier pushed him, causing him to drop his paperwork, pointed the taser at him again, and then charged at him swinging fists at his head. (*Id*. at 15-16). Plaintiff alleges a Deputy John Doe was present and instructed to place him in handcuffs, and failed to protect him from the other deputies. (*Id*. at 16-17). Plaintiff alleges Defendant Partain then tased him after he had been handcuffed. (*Id*. at 17-18). Plaintiff alleges several other John Doe Deputies were present and failed to protect him. (*Id*. at 18). Plaintiff alleges he submitted to the restraints and did not resist. (*Id*. at 16). The John Does were later identified as Defendants Bunn, Fuller, Bates, Adams, Curry, Lindberg, and Dumas. (ECF No. 19, 20).

Plaintiff alleges Jane Doe medical personnel was called after the tasing. Plaintiff alleges this Defendant denied him any medical care after the incident. (ECF No. 6 at 18-19). Jane Doe was later identified as S. Overstreet, LPN. (ECF Nos. 19, 20). Plaintiff alleges Defendants Miller, Taulbee, and Jackson failed to supervise and investigate force incidents. (ECF No. 6 at 19).

Defendants filed their Motion for Summary Judgment on December 15, 2017. (ECF No. 48). On December 18, 2017, the Court entered an Order (ECF No. 51) directing Plaintiff to file

his Response to the Motion for Summary Judgment, which he did on February 9, 2018. (ECF No. 56). A Report and Recommendation was filed on December 18, 2017 recommending that Defendants Steele, Hobbs, Woods, L.P.N. Overstreet, Bunn, Fuller, and Lindberg be dismissed without prejudice from the case because the Plaintiff was unable to effect service of the Complaint upon them. (ECF No. 52). The Report was adopted on January 8, 2018.[1] (ECF No. 53).

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

---

[1] As Plaintiff's sole denial of medical care claim was against Defendant Overstreet, the dismissal of this Defendant also results in the dismissal of Plaintiff's denial of medical care claim from this case.

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. ANALYSIS

Defendants argue summary judgment should be granted in their favor because: (1) Defendants are entitled to qualified immunity for Plaintiff's individual capacity excessive force claims because the videos and other exhibits contradict Plaintiff's allegations of excessive force; (2) due to the extensive training and supervision procedures of SCDC, Defendants Devane, Miller, Taulbee, and Jackson were not aware of any risk to detainees, and alternatively, Plaintiff's claims against these Defendants are based on vicarious liability; and, (3) Plaintiff alleged no official capacity claims. (ECF No. 49).

Plaintiff argues the videos do not show the entirety of the incidents (ECF No. 57 at 19-21), but the footage is still sufficient to support his claim and survive summary judgment. (*Id*. at 3). For both incidents, Plaintiff alleges the guards attempted to provoke him (*Id*. at 5-6), and his actions were misinterpreted as resistance (*Id*. at 4-8).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). "Because the use of force is sometimes required in prison settings, guards are liable only if they are completely unjustified in using force, i.e., they are using it maliciously and sadistically." *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008). Relevant factors to be considered for this inquiry include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, . . .any efforts made to

temper the severity of a forceful response," and the extent of injury to the inmate. *Hudson*, 503 U.S. at 7 (internal quotations omitted).

"Not every malevolent touch by a prison guard gives rise to a federal cause of action." *Jones,* 207 F.3d at 495. Even with malicious motivation, "not every push or shove violates the Constitution, but any use of force greater than *de minimis,* or any use of force that is 'repugnant to the conscience of mankind,' does." *Irving*, 519 F.3d at 446 (citing *Hudson*, 503 U.S. at 9-10). While significant injury is not required, "some actual injury must be shown" and the extent of inflicted pain considered. *Jones,* 207 F.3d at 495. "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). "[U]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Johnson v. Bi-State J. Ctr./Arkansas Dept. of Corrections*, 12 F.3d 133, 136 (8th Cir. 1993).

### A. 2014 Incident

Defendants argue the video of the event showed Plaintiff turning aggressively towards the officers as he entered the barracks pod. (ECF No. 49 at 7). They state he was verbally abusive as they approached the gate to the pod, which was evident in the video as other inmates stopped and looked at the gate as they approached. (ECF No. 50 at 1 ¶ 4). They note that when the officers placed their hands on him he resisted and fought them vigorously. As a result, the officers used "soft hand contact" to place Plaintiff on the floor to handcuff him. When they were unsuccessful in handcuffing him, back-up officers were called, and Officer Wood employed a one-second deployment of pepper spray, after which officers were then able to handcuff Plaintiff. (ECF No. 49 at 7).

5

Plaintiff argues he was not resisting on this date. (ECF No. 57 at 4). He further argues that even if he had been resisting, he could not have overpowered four deputies with his "5 foot ten and 170 pound frame." (*Id*.). He states he was pushed through the barracks gate and only turned around because he was pushed from behind and was being taken to an area to which he was not assigned. He states he became afraid of where they might be taking him and for what purpose. (*Id*. at 4-5). He argues it was not necessary to either take him to the floor or pepper-spray him. (*Id*.).

As a preliminary matter, the Court notes Defendants Steele, Hobbs, and Woods have been dismissed as Defendants from this case. The Court has, nonetheless, reviewed the video provided.[2] The camera is placed inside the barracks and is aimed at a gate with a hall on the other side. Before Plaintiff can be seen on the video, three inmates stop and look toward the gate. One inmate approaches slowly and carefully peers around a corner. One inmate holds his hands to his ears and then walks off. Plaintiff appears on the screen coming through the gate with his left shoulder and back first. As he turns, one of the guards has a fistful of Plaintiff's shirt at the right shoulder and holds his right arm. Plaintiff's facial expression and body posture are such that a reasonable guard could interpret his manner be aggressive. As Plaintiff circles the guard, it is not clear who is directing the movement. He is then slowly taken to the ground by four guards. Plaintiff resists the downward motion, using first feet, then knees, then hands. Although two guards sit or lie on him, and one other guards leans on his shoulders, Plaintiff continues to struggle on the ground. After a short period of time, a guard takes out a canister from a hip holster, presumably the pepper spray, and points it toward the Plaintiff's head for perhaps a second before putting it away. As

---

[2] There is no audio on either of the videos.

this is happening, several other officers come in. Plaintiff is handcuffed, assisted to his feet, and is led back through the gate.

Plaintiff's actions in the video are consistent with Defendants' argument that he was aggressive and vigorously resisted their efforts to control him. There is no question that he continued to struggle while on the ground, despite the efforts of three guards. It was, therefore, necessary to employ force against him to maintain security and order. The movements of the guards in placing Plaintiff on the ground were slow and controlled. Although the Court could not directly see the pepper-spraying directly due to the position of the participants, the canister was aimed toward the Plaintiff's head for not more than one second, permitting the inference that the spraying was done in a short, quick burst. Both the controlled movement and the short burst of pepper spray clearly tempered the severity of the force used. The type or amount of force used during this incident, therefore, is not repugnant to the conscience. Indeed, the Eighth Circuit has recognized that "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy." *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 2000). The application of force to Plaintiff was justified and done in a good faith effort to maintain or restore discipline, thus negating Plaintiff's allegation of excessive force. As there was no use of excessive force in this incident, it is not necessary to address Plaintiff's other claims regarding the incident.

Defendants are, therefore, entitled to summary judgment as a matter of law on Plaintiff's claims for the 2014 incident.

### B. 2015 Incident

Defendants argue Plaintiff "had a tantrum" and refused to go to court when he was told his court time had been changed. This tantrum included physically fighting with and resisting the officers when they tried to escort him out of the jail for his court hearing. (ECF No. 49 at 8; ECF

No. 50 at 3-5). They state he was verbally warned to stop fighting, particularly kicking, or he would be tased. When he continued to struggle, "got in Partain's face," and attempted to "bump into" and kick Defendant Partain, Partain "drive stunned" Plaintiff with a taser in the abdomen. (ECF No. 49 at 8; ECF No. 50 at 4). Defendants also note that the entire pod was out in the dayroom during the incident, with inmates gathering around the guards and Plaintiff rather than going into their cells as ordered. (ECF No. 50 at 4). Plaintiff was then escorted and shackled to a bench, where he continued to "cuss at" and threaten deputies. (ECF No. 50 at 5).

Plaintiff argues he was complying with their orders to go to court, as evidenced by Defendants' Statement of Facts at paragraph 17 that he was gathering his paperwork when Defendant Frazier grabbed his arm. (ECF No. 57 at 6). He also argues that paragraph 18 in Defendants' Statement of Facts states that he was being escorted to the door. (*Id*.). Plaintiff argues there was no tantrum, kicking, or fighting, only abuse from the guards. (*Id*. at 6-7). Plaintiff argues the entire pod was not out, but his cellmates were helping him to pick up his paperwork from the floor. (*Id*. at 12). Plaintiff admits he threatened them with a lawsuit during the incident. (*Id*. at 13). Plaintiff argues he was given no warning before he was tased. (ECF No. 57 at 13). As support for his argument, Plaintiff attached a copy of a memorandum concerning the incident from Defendants Partain and Bunn to Defendants Miller, Jackson, and Dumas. In the memorandum, Miller, Jackson, and Dumas were reprimanded for escalating the situation and placing "the safety of both deputies and the inmate in jeopardy." (*Id*. at 24). It was noted to be a second warning for a policy and procedure violation which resulted in "dangerous circumstances." (*Id*.).

At the beginning of the video four guards are in the room looking at the gate as Plaintiff enters. Another four guards are behind Plaintiff. Plaintiff pulls his arm from a guard. He turns and appears to confront that guard. Two other inmates are near the group. The guard gestures and

8

Plaintiff backs up. One inmate appears to get between Plaintiff and the guard, at which point Plaintiff puts his left arm on the wall and a guard approaches to put handcuffs on his right arm behind him. Plaintiff then steps away from the wall and again faces the guard he confronted earlier. Two inmates begin gathering papers on the floor. They are waved away by the guard, but remain standing by the group. Other inmates are seen climbing stairs by the gate, and at least four inmates stand at the top of the stairs watching the incident. They walk away as the incident progresses.

A guard and Plaintiff appear to be engaging in a verbal exchange, during which Plaintiff looks back at the guard applying handcuffs and jerks his arm forward. Another guard then grabs Plaintiff's right arm and twists it up behind him. The guard originally applying handcuffs then twists his left arm up behind him. Plaintiff takes a large step towards the guard he was exchanging words with earlier, although it is not clear if the twisting of his arms prompted the step or if he bumped into him when he did so. It does not appear that the handcuffs are fastened to both wrists at this point. Plaintiff continues to move his arms. The guard in front of him placed one hand on Plaintiff's right shoulder and one hand in front of Plaintiff at his waist or chest. Plaintiff and the guard engage in another verbal exchange, with Plaintiff looking down at his midsection twice. Although the guards struggle with Plaintiff's arms to finish handcuffing him, it appears they get the cuffs fastened during this exchange. Plaintiff then slumps briefly backward into the guards behind him. He straightens up and is lead out of the gate in handcuffs, and the group proceeds down the hallway out of camera view. The other two inmates, who remained nearby the entire time, handed piles of papers to one of the guards. The Court did not observe any kicking, although the view of Plaintiff's feet was obscured at times.

Defendant Miller's affidavit states the video does not show Plaintiff being tased. Instead, he states Plaintiff resisted both actively and passively, including "going limp." He states he was

9

not tased until he continued fighting, including kicking at Defendant Partain. (ECF No. 50-1 at 3). Plaintiff alleges he fell through the door and onto the hallway floor after being tased, citing the video footage as evidence. (ECF No. 57 at 13 ¶ 23). In another portion of his response, Plaintiff alleges one can see the light of the taser on him in the video as he falls to the floor. (ECF No. 57 at 22). In the same paragraph, however, Plaintiff alleges he was tased when he was out of view of the camera. (*Id.*).

Defendant Partain's narrative in the incident report states Deputies McCollum and Frazier placed Plaintiff in handcuffs near the pod door, but Plaintiff continued to struggle. He then placed the taser against Plaintiff's abdomen and told him he would drive-stun him if he did not stop fighting. Plaintiff continued to curse at him, demand that he "get that thing off," and continued to kick at him. Partain then applied a three to five second drive-stun, and Plaintiff stopped fighting long enough to get him out of the pod vestibule. L.P.N. Overstreet noted no injuries that needed any treatment after the tasing. (ECF No. 50-1 at 17).

Taking Plaintiff's allegations that the tasing can be seen on the video as true, Plaintiff's argument that he was completely compliant with orders during the July 2015 incident is contradicted by the video. During the video he jerks his arm from a guard at least twice, and struggles to keep the handcuffs from being attached to both arms, requiring three guards to successfully handcuff him. Plaintiff continued the exchange with the guard in front of him after he was handcuffed, while the guard held his hand at Plaintiff's midsection or chest. Assuming this hand was holding the taser, the tasing was very brief, and was done using the milder drive-stun mode rather than the dart mode.[3] *See Imp v. Wallace*, 2011 WL 4396941, *5 n. 10 (D. Minn. Sept 21, 2011) (explaining that the drive-stun mode causes a painful stimulus, but does not penetrate

---

[3] Plaintiff does not address or dispute the taser mode used. (ECF No. 57 at 13 ¶¶ 23-24).

the skin with darts and does not cause neuro-muscular interruption); *McKenney v. Harrison*, 635 F.3d 354, 364 (8th Cir. 2011) (drive-stun mode presses electrical nodes against a person's body as opposed to firing metal darts into the body). Further, as argued by Defendants, several inmates gathered to watch the incident, including two who were among the guards and refused to leave after being waved away.

Plaintiff's actions in jerking his arm out of the grip of guards twice, and requiring several guards to control him, are consistent with Defendants' arguments that he resisted the officers. It was, therefore, necessary to apply force to maintain safety and control. At the same time, other inmates were nearby, unrestrained, and two of them did not leave the group when waved away by a guard. It was reasonable for the guards to perceive an increased threat in the situation and the need to quickly gain control of Plaintiff. Although he was tased after three guards working together managed to handcuff him, the tasing occurred after he continued his noncompliant behavior, it was brief, and Defendant Partain utilized the milder drive-stun mode to do so. The severity of the force used was tempered. Under these circumstances, the use of handcuffs and a taser was justified and applied in a good faith effort to maintain or restore control and discipline. *See e.g. Stevenson v. Cordova*, No. 17-1053, --- F. App'x ---, 2018 WL 2171179, * 3 (10th Cir. May 11, 2018) (tasing an inmate three to five times when he resisted handcuffing by two guards and was in an area of the prison accessible to other inmates did not support an inference of malicious or sadistic behavior); *Jasper v. Thalacker*, 999 F.2d 353, 354 (8th Cir. 1993) (using a stun gun to subdue an unruly inmate did not violate the Eighth Amendment when not used maliciously or sadistically even if other options available); *Caldwell v. Moore*, 968 F.2d 595, 601-02 (6th Cir. 1992) (the use of a stun gun and strait jacket to quiet a disruptive inmate in an isolation cell did not violate the Eighth Amendment).

Plaintiff has failed to provide any evidence in the summary judgment record that the tasing was anything other than the result of a good faith effort to maintain or restore discipline. To the contrary, the memorandum Plaintiff submitted in response to the Motion for Summary Judgment reprimanded several guards because their actions that day had resulted in "dangerous circumstances" which "placed the safety of both deputies and the inmate in jeopardy." (ECF No. 57 at 24). As discussed above, Plaintiff was noncompliant throughout the video footage, requiring several guards to control him. Plaintiff's allegation of open wounds from the taser (ECF No. 6 at 19) are contradicted by the record, as he provided no proof that he sustained any discernable injury during the incident, and the incident report indicated he had no treatable injuries. (ECF No. 50-1 at 17). Further, Plaintiff does not dispute that he was taken to court immediately after the incident (ECF No. 57 at 13 ¶ 26), where any bleeding wounds or other non-*de minimis* injuries would have been apparent and noted.

In summary, Plaintiff's clear lack of compliance in the video footage, coupled with his own exhibit stating that the situation had become dangerous to both himself and the guards, contradicts his allegation that Defendant Partain was completely unjustified in applying the taser to maintain or regain order and discipline. Further, the lack of any discernable injury to Plaintiff contradicts his allegation that Defendant Partain acted maliciously or sadistically to cause harm. *See, e.g., Hollingsworth v. City of St. Ann*, 800 F.3d 985, 990-91 (8th Cir. 2015) ("despite the Taser's unique capability to cause high levels of pain without long-term injury, we have not categorized the Taser as an implement of force whose use establishes, as a matter of law, more than *de minimis* injury.") (internal quotations omitted).

As there was no use of excessive force in this incident, it is not necessary to address Plaintiff's other claims regarding the 2015 incident. Defendants are entitled to summary judgment as a matter of law on Plaintiff's claims for the 2015 incident.

For these reasons, IT IS ORDERED that Defendants' Motion for Summary Judgment. (ECF No. 48) is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED this 23rd day of July 2018.

Judgment will be entered accordingly.

*/s/ P. K. Holmes, III*
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE